UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN G. NELSON,

                        Plaintiff,                        Case Number 22-12822

v.                                           Honorable David M. Lawson

DETROIT TIGERS, INC.,

                        Defendant.

_____/

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff John Nelson worked for the Detroit Tigers baseball organization for 42 years, the last 29 years serving as the Visiting Clubhouse Manager. After he was fired from his job in 2021 at age 58, he filed this lawsuit alleging age discrimination under federal and state law. The defendant, Detroit Tigers, Inc., has moved for summary judgment, arguing that the record does not support Nelson's *prima facie* case and that it has offered a legitimate and unrebutted nondiscriminatory reason for his termination: poor performance. The evidence in the record shows that Nelson's performance waned in 2017, and he was told he had to improve. But after subsequent performance evaluations disclosed improved performance — even including compliments from his supervisor — he was fired anyway. There is plenty of evidence in this record from which a jury could conclude that Nelson's age was the reason he was fired. Because the Court must view that evidence most favorably to Nelson at this stage of the case, the motion for summary judgment will be denied.

## I. Facts and Proceedings

Plaintiff John G. Nelson began working for the Detroit Tigers baseball organization in 1979, when as a teenager he started with the team as a batboy. Nelson worked his way up through the Tigers organization in various jobs and eventually was promoted to Visiting Clubhouse

Manager in 1992.  He held that position until his termination on October 11, 2021.  Nelson was terminated ostensibly based on complaints about his poor performance tending to the needs of visiting team players in the Tigers' visitor's clubhouse.  He was 58 years old when he was fired.

Sam Menzin joined the Tigers as an intern in 2013 and rapidly ascended the corporate ladder, being promoted eventually to Director of Baseball Operations in 2021.  Menzin was born in 1990, and at the time plaintiff was fired, Menzin was 31.  It is undisputed that the decision to terminate the plaintiff was made solely by Menzin.

Dan Ross is a former Visiting Clubhouse Assistant Manager.  The day after Nelson was fired, then 34-year-old Ross was promoted to fill the vacancy.  One year later, Ross was promoted again to the role of Home Clubhouse Manager.

Jim Schmakel is the former Home Clubhouse Manager for the Tigers organization.  When the plaintiff was terminated in October 2021, Schmakel was 70 years old.  In 2023, when Schmakel was 72, he was demoted to Visiting Clubhouse Manager, at the same time that the much younger Dan Ross was promoted into his former post.

The defendant contends that Nelson was fired based on his inability to improve his performance adequately to meet the needs of visiting team players who frequented the Tigers' visiting team clubhouse during the 2021 baseball season.  It says that Nelson's poor performance was documented in a 2017 survey of visiting team clubhouses compiled by the Major League Baseball organization, and that complaints relayed to Menzin in 2021 confirmed that Nelson had failed over several years to improve his performance to address the documented issues.  Nelson, however, says that his formal performance reviews show otherwise and demonstrate that his performance improved markedly and was excellent in the timeframe leading up to his firing.

## A. Clubhouse Organization

Jim Schmakel was born in 1951 and worked for the Tigers baseball organization since 1978.  He served as the Tigers Home Clubhouse Manager for 44 years, until he was demoted to the position of Visiting Clubhouse Manager in November 2022.  Schmakel also worked as a human resource manager for Eltra Corporation from 1975 to 1983, and in that position he helped to develop performance review processes and job descriptions.  In his position as Home Clubhouse Manager, Schmakel prepared formal evaluations of all his subordinates including Home Clubhouse Assistant Manager Dan Cave, Visiting Clubhouse Assistant Manager Dan Ross, and plaintiff John Nelson.  Schmakel testified that the role of Home Clubhouse Manager was more lucrative because the home team players consistently gave more generous tips to the clubhouse staff compared with players from the visiting teams.  Schmakel testified that the position of Operations Director that Menzin filled made him Schmakel's boss, but that Schmakel himself directly supervised the staff in both clubhouses, including plaintiff Nelson.  Schmakel said that the organization was rearranged in 2021 after Nelson was terminated, and after that point it was his understanding that Menzin intended to supervise all staff in both clubhouses directly.

## B. Plaintiff's Performance Reviews

Schmakel prepared written evaluations of Nelson for many years, and his evaluations prepared in 2017, 2018, 2019, and 2020 have been entered into the record.  Schmakel interacted with Nelson at least weekly during the baseball season, and he drew on various sources to prepare his evaluations, including comments made to him by stadium operational staff, visiting team players, trainers, and travel staff, and sometimes the visiting teams' own clubhouse managers if they traveled with a team.  Schmakel did not prepare a review for 2021 because Nelson was terminated the day after the season ended.  However, Schmakel said that if he had prepared an

evaluation in 2021, he would have rated Nelson's performance as "pretty good" and similar to his assessment in 2020.

Schmakel prepared a written evaluation of Nelson on December 22, 2017.  He noted that Nelson's performance during the 2017 season had resulted in many complaints by visiting teams:

> [A]s we have discussed, the traveling secretaries had numerous negative comments this winter. [T]hey touched on cleanliness, overall attitude, cooperation with caterers, presentation of catered foods. [M]ore than one comment [was made] that you had become lazy and were unmotivated. [O]ne said that this was not the John Nelson that had previously run the visiting clubhouse. [A] player union rep said that he had been told that John Nelson was just going [through] the motions. [Y]ou admitted that the CBA changes affected your outlook and your fear of the negative financial impact that could occur (and did occur). [S]trength guys complained [that] the physical condition of their workout room was not good (not clean).

Performance Evaluation dated Dec. 22, 2017, ECF No. 20-6, PageID.205.  It is undisputed that the allusion to "CBA changes" refers to changes in the Major League Baseball player collective bargaining agreement that in 2017 eliminated the system of visiting team "dues" historically paid to cover visiting clubhouse services.  Before 2017, each visiting team player had paid a stipend to the plaintiff directly (estimated by the plaintiff at around $70 per player), and the plaintiff then used those funds to procure all needed food and concessions to stock the visiting team clubhouse. If the plaintiff was able to cover all necessaries while spending less than the dues paid, then he kept the excess.  Visiting team players also could leave tips for the clubhouse manager, which Nelson customarily was expected to share with all visiting clubhouse staff.  When the dues system was eliminated, all visiting clubhouse expenses were required to be paid directly by the hosting team, so the plaintiff's opportunity to gain extra income from excess dues was eliminated, leading to a significant reduction in his total income.  He conceded during his 2017 review that the decrease in compensation was a factor that led to his poor job performance that season.  Under the section for "Development Needs," Schmakel wrote that Nelson should focus on, among other things, "maintaining a cleaner and better organized clubhouse as we move into 2018."  *Id.* at 206.  Nelson

fared poorly in almost every scored category of the evaluation covering "Core Values," with a rating of "Further Development Needed" in the areas of "Integrity," "Thinking Big & Setting Goals," "Perseverance & Commitment," "Excellence," "Humility & Character," and "Courage & Risk Taking." *Ibid.* He received modestly higher ratings of "Regularly Exhibits" in three areas, "Creativity & Innovation," "Diversity in Every Way," and "People & Giving Back." *Id.* at 206-07. In three summary rating categories, Nelson was scored with "Further Development Needed" in terms of "Core Values," and "Needs Improvement" for "Performance Rating" and "Overall Rating." *Id.* at 207.

The plaintiff's 2018 performance review refers to a survey of visiting clubhouse facilities which was compiled by the Major League Baseball organization for each of its teams in December 2018. *See* Detroit Tigers Visiting Clubhouse Review dated Dec. 19, 2018, ECF No. 20-4, PageID.177. The survey report summarized for each team whether their visiting clubhouse facilities met standards for quality of services and facilities specified by "Attachment 47" to the MLB collective bargaining agreement adopted in 2017. The report was based on surveys completed by visiting teams after games played in Detroit during the 2018 season, as well as an "on-site audit" conducted by a member of the MLB Commissioner's office. The report panned the visiting clubhouse operation across the board, calling out that Detroit's clubhouse was ranked 28th out of 30 clubs in the league, and that it was "the only Club in the Major Leagues to receive an average score of less than 3.0 in all five graded categories." *Id.* at PageID.178. The report stated that a "handful of Clubs made note of the excellent work the Assistant Clubhouse Manager does, but overall, Clubs viewed Detroit as failing to meet expectations in every regard." *Ibid.* The on-site audit results included "poor" ratings in the areas of "Planning and Accountability," "Food Safety Management," and "Coaches' Facilities." *Ibid.* The reported noted that services for visiting

teams were "constrained by an older facility that has spatial limitations," but observed that "the clubhouse could be improved by appropriate staff members becoming certified to handle food," and "by upgrades to the locker room carpet and clubhouse lighting system." *Ibid.* The audit report specifically called out that plaintiff Nelson was "the only clubhouse employee who takes an active role in food preparation, but he is not certified to handle food," and that during the visit there were several observations of unsafe food handling practices. *Id.* at 181. The remaining specific noted deficiencies concerned aging and cramped facilities, but there were no notations indicating that Nelson had any responsibility for those deficiencies. *Id.* at 182-83. The plaintiff testified that in response to the survey recommending that he become food safety certified, he completed training and received a "ServSafe" food handling certification in 2018, and he informed Schmakel upon receipt of that credential.

Schmakel prepared another written evaluation of the plaintiff on December 4, 2018. In the headline commentary, Schmakel wrote: "Comments from 2017 linger. There is a need to not only continue to do an above average clubhouse job but to do a campaign of positive public relations with all of the travel [secretaries] because there remains an air of negativity. [T]he MLB ranking of 28th cannot be repeated." Performance Evaluation dated Dec. 4, 2018, ECF No. 25-2, PageID.287. However, Schmakel also wrote that Nelson's "relationship[s] with visiting club vendors were strong," and that "clubhouse management — cleaning, repair, etc. is good." *Ibid.* Nelson scored notably higher across the board in terms of Core Values, with ratings of "Exceeds Expectations" in the categories of "Diversity in Every Way" and "People & Giving Back," and ratings of "Regularly Exhibits" in every other area. *Id.* at 288. He was rated "Regularly Exhibits" in terms of Core Values overall, but his Performance Rating and Overall Rating remained at "Needs Improvement." *Ibid.*

Schmakel prepared another written evaluation on November 15, 2019.  This review was notably more positive than the 2017 and 2018 assessments.  Schmakel wrote as follows:

> John does a good job working with his visiting teams and adapting recently to the new guidelines of assisting teams with their daily food needs.  His many years of experience makes it good for him as he goes about his daily duties.  There are never any mistakes made in terms of unpack, repack, cleanliness, etc.  Even though his clubhouse (compared to many other visiting clubhouses) is substandard, he makes do with what he has.

Performance Evaluation dated Nov. 15, 2019, ECF No. 25-3, PageID.291.  Schmakel noted that Nelson's "Key Strengths" included being "dependable" and "personable," and that he "works well with all Detroit Tigers front office personnel," and maintains a "staff that is always high quality." *Ibid.*  Schmakel's only suggestions for improvement were that Nelson could "maybe find other caterers that he can recommend to visiting clubs."  In response to Nelson's self-imposed goal "To continue to be on top of cleanliness in the locker room," Schmakel wrote "[A]gree on cleanliness needs — so far so good — but changing food safety standards need all of us to be over cautious on food safety needs."  *Ibid.*  This time around, Nelson scored "Exceeds Expectations" in every area of Core Values except Integrity, Excellence, and Courage & Risk Taking, where he was scored "Regularly Exhibits."  *Id.* at 292.  He was scored "Exceeds Expectations" overall for Core Values and received ratings of "Excellent" for both his Performance Rating and Overall Rating. *Id.* at 292-93.

Schmakel's final performance evaluation for Nelson was prepared on November 12, 2020.  This evaluation was the most complementary to date.  In the headline summary, Schmakel wrote:

> 2020 covid year was a tough year and John rose to the occasion[.] [M]ultiple protocols, multiple meals [served], multiple games played and John not once received any criticism. [I]n fact a few teams took the time to call me and tell me how good the clubhouse was run. [M]any complemented the food and its delivery.

Performance Evaluation dated Nov. 12, 2020, ECF No. 25-4, PageID.295.  Under "Key Strengths," Schmakel noted that Nelson's "years of service [were] a plus in this tough year," "his staff was

very good," "his attitude all year was great in times — again — of multiple protocols," and "[J]ohn is well liked by all staffers that interact with [him]." *Id.* at 296.  In response to Nelson's self-directed goals "[t]o again take on the challenges with Covid and the protocols," and to "[c]ontinue to keep high standards for cleanliness and food safety," Schmakel had nothing to add. *Ibid.* Nelson again scored "Regularly Exhibits" or "Exceeds Expectations" in every category of Core Values, and he received ratings of "Fully Satisfactory" for both the Performance Rating and Overall Rating. *Id.* at 297-98.

## C. Defendant's Termination Decision

The plaintiff testified that before October 2021, he had only limited interactions with Sam Menzin in his role as Director of Baseball Operations, but during 2020 and 2021 he had some conversations with Menzin about "COVID protocols," because Menzin was in charge of implementing COVID precautions.  However, Nelson never discussed other aspects of visiting clubhouse operations with Menzin.  On October 11, 2021, Nelson was summoned by Menzin to meet him at the Tigers offices, and when Nelson arrived he was greeted by Menzin and Karen Gruca, a Tigers HR staffer.  Menzin "briefly mentioned" the 2017 MLB clubhouse survey, but he did not say that there had been any similar complaints about Nelson's performance keeping up the visiting clubhouse, or that Menzin had observed any instances of poor performance or received any complaints from clubhouse staff or from anyone else about Nelson's service on the job. Menzin then told Nelson that the Tigers were "going in a different direction," and that Nelson was terminated.  Nelson further testified that in 2019 and following years, Schmakel never had mentioned to him any ongoing complaints about the visiting clubhouse operations, and that his written evaluations indicated that he was "doing a good job."

Sam Menzin testified that as Director of Baseball Operations, he was in charge of multiple departments, including "strength and conditioning," "mental skills," "nutrition," "scouting," and

both home and visiting clubhouses.  The decision to terminate Nelson was made solely by Menzin.  Menzin was asked if he "sought input from anyone" before making the termination decision, and he responded: "I spoke with various visiting clubs, their directors of travel or clubhouse managers that worked with John on a daily basis when they came in to play with the Tigers."  Sam Menzin dep., ECF No. 20-5, PageID.192.  Menzin was asked if he had any documentary records of his communications with other baseball clubs such as text messages or emails, and he said he did not.  Menzin also never identified any visiting baseball teams or their personnel with whom he communicated about Nelson's performance in 2020 or 2021, actually refusing to name names on the instructions of his lawyer.  Menzin explained that he "was in touch with various other teams and asked for their feedback on the visiting clubhouse operation," communicating "both [by] phone and in person."  *Id.* at PageID.201.  He was evasive, however, on details of his investigation, stating that "I don't remember the specifics of each conversation."  *Ibid.*  He said he took notes during the conversation, but he never disclosed the contents of the notes at his deposition, and they are not in the record.

Menzin was asked if Nelson ever was presented with any written or oral criticism of his job performance or advised that "his job was on the line" after 2019, and Menzin said he was not aware of any communications discussing Nelson's performance, other than the written evaluations prepared by Schmakel.  Menzin said that his 2021 investigation of Nelson's performance was instigated by complaints received from Dan Ross about Nelson's practices of sharing tips received from visiting players; however, Menzin conceded that there was no formal policy on tip sharing, and Nelson's handling of tips had not violated any workplace rules.

Menzin testified that he also made the decision to replace Nelson with Dan Ross after Nelson was fired.  Menzin also made the subsequent decision in 2022 to demote Jim Schmakel to

Visiting Clubhouse Manager and promote Dan Ross as his replacement for Home Clubhouse Manager in 2022. Menzin again was evasive when asked about the reasons for that decision and testified only that "certain players" had complained about the service received in the home clubhouse; but he refused to identify any players who had complained or to discuss the substance of any of their "confidential" complaints. *Id.* at 195.

### D. Procedural History

The plaintiff filed his complaint on November 21, 2022, and an amended complaint was filed by stipulation of the parties on March 13, 2023. The amended complaint added claims under Title VII after a right to sue letter was issued. However, on October 19, 2023, the Court dismissed all of the claims of race discrimination (Counts I, II, and Count IV in part) upon the parties' stipulation. Only the plaintiff's claims of age discrimination contrary to the Age Discrimination in Employment Act (ADEA) and the Elliott-Larsen Civil Rights Act (ELCRA) (Count III, and surviving Count IV) remain live.

## II. Discussion

The parties agree that there is no direct evidence of age discrimination in the record in this case. The plaintiff proceeds on the basis of circumstantial evidence. In its summary judgement motion, the defendant argues that the plaintiff offered no proof on one element of his *prima facie* case — that he was qualified for his job — and that it has shown that it had a legitimate, nondiscriminatory reason for firing him — poor performance. The defendant maintains that the plaintiff has not rebutted that assertion adequately in this record, especially since, it believes, it was entitled to deference for exercising its own business judgment. The defendant contends that it therefore is entitled to a judgment of dismissal as a matter of law.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute.  *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating 'against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's age.'"  *Goodale v. Elavon, Inc.*, No. 23-5013, 2023 WL 9111441, at *2 (6th Cir. Dec. 12, 2023) (quoting 29 U.S.C. § 623(a)(1)).  "A plaintiff may prove an ADEA violation through direct or circumstantial evidence, but, either way, [he] bears the burden of proving that [his] age was a but-for cause of the employer's decision."  *Ibid.* (citing *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176-77 (2009)).  "'Under *Gross*, satisfying but-for cause requires plaintiffs to show that age had a determinative influence on the outcome of the employer's

decision-making process.'" *Ibid.* (quoting *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *Gross*, 557 U.S. at 176) (cleaned up).

"In the absence of direct evidence of discrimination, ADEA claims are analyzed in accordance with the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Goodale*, 2023 WL 9111441, at *2 (citing *Geiger*, 579 F.3d at 622). Under that familiar rubric, "[t]he burden is on the plaintiff to establish a *prima facie* case of discrimination." *Ibid.* (citing *McDonnell Douglas*, 411 U.S. at 802). "If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Goodale*, 2023 WL 9111441, at *2 (citing *McDonnell Douglas*, 411 U.S. at 802). "If the defendant satisfies its reciprocal burden, the burden then shifts back to the plaintiff to establish that the stated reason was pretextual." *Ibid.* (citing *Romans v. Mich. Dep't. of Hum. Servs.*, 668 F.3d 826, 838 (6th Cir. 2012)).

"Age-discrimination claims under both the ADEA and the ELCRA utilize the *McDonell Douglas* framework." *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 575 (6th Cir. 2023) (citing *Lewis v. City of Detroit*, 702 F. App'x 274, 278-79 (6th Cir. 2017); *Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 704 (6th Cir. 2016)); *see also Payne v. Benteler Auto. Corp.*, No. 21-1238, 2022 WL 1665330, at *3 (6th Cir. May 25, 2022) ("'ELCRA age-discrimination claims are analyzed under the same framework as [ADEA] discrimination claims.'" (quoting *Tilley v. Kalamazoo Cnty. Rd. Comm'n*, 777 F.3d 303, 307 (6th Cir. 2015)).

## A. *Prima Facie* Case

As mentioned above, neither side contends that there is direct evidence of age discrimination in the decision to terminate John Nelson. Nelson, therefore, proceeds on the theory that circumstantial evidence in the record shows that the termination decision was based on his

age.  Proceeding that way, Nelson must first produce evidence of a *prima facie* case.  "To establish a *prima facie* case of age discrimination, a plaintiff must show: '(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'"  *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008); *Crossley v. Kettering Adventist Healthcare*, No. 23-3346, 2024 WL 338163, at *5 (6th Cir. Jan. 30, 2024).

The defendant concedes that Nelson satisfies the first and third elements because he was over 40 years old when he was fired, and termination qualifies as an adverse employment action. The defendant attempts to cast Nelson's supposed performance failures as negating his showing on the second element that he was qualified for the job.  However, there are substantial questions of fact about the plaintiff's job performance in 2021 when he was let go, and in any case other evidence in the record suffices to suggest that the plaintiff amply was qualified for the job of Visiting Clubhouse Manager.

As the Sixth Circuit has explained, "[a]t the *prima facie* stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (*en banc*).  "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576.  Here, it is undisputed that Nelson had nearly three decades of experience actually performing the job of Visiting Clubhouse Manager for the Tigers organization.  Nelson's lengthy experience and demonstration of the practical skills required is sufficient at the least to establish a question of fact about whether he was qualified to

perform the job that he had held for almost three decades.  The defendant has not identified any other objective criteria for the position that the plaintiff did not satisfy in 2021, and it has not identified any way in which the objective qualifications for the job had evolved during the plaintiff's tenure so as to render him unqualified to continue in the position.

Moreover, the Sixth Circuit has held that it is inappropriate for the Court to consider the defendant's proffered non-discriminatory reason for an adverse action when evaluating the first step of the three-part *McDonnell Douglas* analysis.  To do so, explains the *en banc* Sixth Circuit, "would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler*, 317 F.3d at 574-75.  The defendant's argument improperly conflates its proffered reason for the adverse action with the elements of the plaintiff's *prima facie* case.  Certainly, a qualified individual must perform "at a level which met his employer's legitimate expectations." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (quotation marks omitted).  But Nelson has demonstrated by virtue of his decades of past performance in the job that he was qualified to perform it; that is all that is required.  Moreover, as the following discussion shows, the record evidence certainly is not conclusive on whether the plaintiff's performance in 2021 failed to satisfy the legitimate expectations of his employer.

The defendant also challenges the fourth element of the *prima facie* case — that the record discloses circumstances that support an inference of discrimination.  However, the plaintiff's evidence that he was replaced by his former subordinate who was 24 years younger at the time suffices to raise such an inference.  It is undisputed here that Dan Ross was promoted immediately after plaintiff's termination to fill the vacant position.  It also is undisputed that Ross was more than two decades younger than the plaintiff when he was promoted.

The defendant contends that Nelson was not "replaced" by Ross because, approximately a year later, Ross was himself replaced by the 72-year-old Schmakel, when Ross was again promoted to the position of Home Clubhouse Manager. It is undisputed, however, that immediately after Nelson was fired and for at least a year thereafter, his "replacement" in fact was the much younger Ross.

Moreover, the apparent pattern of decisions by Menzin reshuffling positions to advance younger workers at the expense of older staff — who were terminated or demoted — further circumstantially bolsters an inference of discrimination. Schmakel testified that the manager position in the visiting clubhouse was significantly less lucrative than the home clubhouse position that he had held for decades, and the evidence suggests that Menzin demoted Schmakel in order to promote Ross into that more lucrative position. Menzin himself stated that the home team players expressed dissatisfaction with Schmakel, but that he believed that Schmakel's diminished level of performance would be sufficient to furnish visiting teams "that level of service." Sam Menzin dep., ECF No. 20-5, PageID.197. That contradictory rationalization raises doubts about the credibility of Menzin's justification for shuffling the clubhouse roster.

The plaintiff also points out that the realignment passed over Mark Cave (age 50), who had held the position of Home Clubhouse Assistant Manager for decades. It also is undisputed that Dan Ross's position as Visiting Clubhouse Assistant Manager was filled by an even younger person, Kaolayao Pritchet (age 27). Such a pattern of purging older employees leaving younger staff to fill the gaps has been found to support an inference of discrimination. *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 347 (6th Cir. 2015) ("The evidence shows that Walmart discharged three older employees (ages 54, 59, and 62 years) for engaging in the same conduct, leaving the Lawn and Garden Department staffed primarily by three significantly younger employees (ages

19, 21, and 23), and hired two significantly younger employees as replacements (ages 19 and 21). The composition of the Lawn and Garden Department before and after Plaintiffs' terminations supports an inference of age discrimination.").

The plaintiff sufficiently has established all of the elements of his *prima facie* case.

### B.  Legitimate Reason for Termination

The defendant has cited poor performance as its reason for firing Nelson.  That, certainly, would be proper justification for that adverse employment decision.  *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).  To advance his case, Nelson must offer evidence that creates a fact question about whether that proffered reason was a pretext for age discrimination.  *Levine v. DeJoy*, 64 F.4th 789, 798 (6th Cir. 2023).  "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action."  *Ibid.* (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)).

Nelson has offered evidence that the justification of poor performance had no basis in fact sufficient to put to a jury the question whether the supposed performance deficiency in 2021 was factually grounded.

The record evidence shows that Nelson received glowing performance reviews in 2019 and 2020, which reflected no hint of the poor performance that gave rise to complaints compiled by the 2017 MLB clubhouse survey and noted in the plaintiff's disparaging 2017 and 2018 performance reviews.  The 2019 and 2020 evaluations suffice to raise a question about whether, as the defendant contends, the plaintiff had failed to improve his performance over the ensuing three years.  Menzin's testimony on this topic was evasive and insubstantial, and he identified no

specific sources from whom he claims to have received fresh complaints about visiting clubhouse operations in 2021.  No documentary evidence of any such complaints has been produced, no complainants were identified by name, and no other specific factual details were offered. Schmakel's written evaluations, in contrast, specifically noted that complaints about the visiting clubhouse had been conveyed to him regularly over the years, and the 2019 and 2020 evaluations specifically stated that there had been no recent complaints — that in fact sources from visiting teams had reached out to compliment Nelson's recent performance.  In fact, Schmakel wrote that "a few teams took the time to call me and tell me how good the clubhouse was run. [M]any complemented the food and its delivery."  Performance Evaluation dated Nov. 12, 2020, ECF No. 25-4, PageID.295.

Based on the absence of any substantive details in Menzin's testimony, contrasted with the specific and contrary documentation in Schmakel's evaluations, a jury reasonably could question the veracity of Menzin's testimony and dismiss his assertion that unnamed sources had complained to him in 2021 that Nelson had failed to improve his performance as clubhouse manager.  To show pretext on the ground that the defendant's proffered reason for firing him lacked a factual basis, the plaintiff "must provide evidence that the [alleged failure of performance] never happened." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021).  The plaintiff has presented sufficient evidence to allow a jury to conclude that he achieved a dramatic turnaround in his performance from 2017 to 2020, to the point that his work was deemed "Fully Satisfactory" in his last written review, and that the supposed failure of performance in 2020 and 2021 in fact never occurred.

The defendant insists, however, that it can defeat a claim of pretext if it can show that Menzin held an "honest belief" that the plaintiff's performance had not improved by 2021.  The

Sixth Circuit "has adopted a 'modified honest belief' rule, which provides that for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the *particularized facts* that were before it at the time the decision was made." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) (cleaned up) (emphasis added).  In this instance, the defendant has failed to put forth any proof of "particularized facts" on which Menzin says he relied when concluding that Nelson's performance had not improved from 2017 through 2021.  In his testimony Menzin merely alluded to unnamed sources with whom he had communicated about visiting clubhouse conditions, and he refused to elaborate on either the identity of any such sources or the substance of any supposed complaints. Menzin says that his "investigation" of Nelson's performance was prompted by complaints from Nelson's subordinate, Dan Ross.  But Menzin said that Ross's complaints focused on Nelson's handling of tip sharing, and the defendant has not identified any specific deficiencies in Nelson's handling of visiting clubhouse services that were documented by Ross.  "The employer need not show that it left no stone unturned.  But if the employer conducts no meaningful investigation, it cannot show the requisite 'honest belief.'" *Fisher v. Airgas USA, LLC*, No. 23-3286, 2024 WL 366246, at *2 (6th Cir. Jan. 31, 2024).  Here, it appears that Menzin's "investigation" consisted of making a few phone calls to unnamed sources, the substance of which is not found in the record. Based on the absence of substantive details in Menzin's testimony, a jury fairly could conclude that Menzin in fact undertook no meaningful investigation of the plaintiff's supposed performance failures.

C.  ELCRA Claim

Finally, for all of the above reasons, the plaintiff also adequately has made out a *prima facie* case under ELCRA, and the defendant has not identified any dispositive distinctions in the framework of analysis that should lead to a different outcome under state law.

III.  Conclusion

The plaintiff has presented sufficient evidence to establish all the elements of his *prima facie* case and to rebut the defendant's proffered non-discriminatory reason for the termination decision.  Genuine questions of fact remain about whether age had a determinative influence on the defendant's decision to fire him.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 20) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  March 15, 2024

- 19 -